RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0041p.06

# UNITED STATES COURTS OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JON JERMER,

    *Plaintiff-Appellant,*

v.

SIEMENS ENERGY & AUTOMATION, INC.,

    *Defendant-Appellee.*

No. 03-4191

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 02-00448—Sandra S. Beckwith, District Judge.

Argued: December 10, 2004

Decided and Filed: January 25, 2005

Before: MERRITT, GIBBONS, and ROGERS, Circuit Judges.

---

## COUNSEL

**ARGUED:** David G. Torchia, TOBIAS, KRAUS & TORCHIA, Cincinnati, Ohio, for Appellant. Keith P. Spiller, THOMPSON HINE, Cincinnati, Ohio, for Appellee. **ON BRIEF:** David G. Torchia, TOBIAS, KRAUS & TORCHIA, Cincinnati, Ohio, for Appellant. Keith P. Spiller, THOMPSON HINE, Cincinnati, Ohio, for Appellee.

---

## OPINION

---

    MERRITT, Circuit Judge. This Ohio diversity case arises from the plaintiff-employee's so-called "*Greeley*" claim against his former employer for wrongful discharge. The specific claim is that he was dismissed in retaliation for raising complaints about the air quality at the employer's facility in Ohio. The district court rejected the claim.

    In Ohio, common law claims of wrongful discharge in violation of "public policy" were created by the case of *Greeley v. Miami Valley Maint. Contractors, Inc.*, 551 N.E.2d 981 (Ohio 1990). Relevant "public policy" may arise from a number of sources including the federal and Ohio Constitutions, statutory law, administrative rules or the common law, according to *Kulch v. Structural Fibers, Inc.*, 677 N.E.2d 308, 320-21 (Ohio 1997). Five years after *Greeley*, the Ohio Supreme Court in *Collins v. Rizkana*, 652 N.E.2d 653, 657-58 (Ohio 1995), set out the following four necessary elements of this new "public policy" claim, the second of which (the "jeopardy element") is at issue in this appeal:

    1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).
    2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).
    3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).
    4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).

*Id.* (emphasis in original). The Court held that the first two elements are questions of law while the latter two are questions of fact. *Id.* at 658. This language from *Collins* is very general and leaves a lot of room for interpretation. The meaning of these four elements for this new Ohio tort has not yet gained the level of clarity or certainty that allows predictive outcomes.

    The question before us is the meaning of the second element, the so-called "jeopardy element." Our interpretation of this gateway element is as follows: although complaining employees do not have to be certain that the employer's conduct is illegal or cite a particular law that the employer has broken, the employee must at least give the employer clear notice that the employee's complaint is connected to a governmental policy. It must be sufficiently clear from the employee's statements that he is invoking governmental policy that a reasonable employer would understand that the employee relies on the policy as the basis for his complaint. Because the employee here never connected his statements about air quality to governmental policy or mentioned or in any way invoked governmental policy as the basis of his complaint, we agree with the district court that his case must be dismissed for the failure to show that his dismissal would "jeopardize" Ohio's public policy.

## I.

    Plaintiff Jon Jermer was hired in December 1998 by defendant, Siemens Energy, to work as a manufacturing engineer in Siemens' Norwood, Ohio, facility. Steve Kroeger served as Jermer's supervisor.

    In early 1999, responding to complaints from other employees about the air quality at the facility, Siemens had its insurance company conduct air quality testing. Several key pieces of equipment could not be physically examined, and the testing was inconclusive. Some employee complaints continued. In November 1999, following up on these continued complaints, Kroeger, the supervisor, assigned Jermer the task of investigating the situation. Jermer alleges that it was about this time that he heard the supervisor state that Franka Cope, one of the employees who had complained about the air, should be fired for her complaints. She was not, in fact, discharged or otherwise disadvantaged, according to the record.

    Jermer hired Ungers & Associates to conduct a second analysis. This testing was delayed until May 2000, after the heating was turned off for the summer. The test indicated the presence of several varieties of mold, some of which were potentially harmful to human health. Ungers' report noted that the HVAC system was unable to effectively regulate humidity. It recommended that Siemens "consider changes to the HVAC system that would improve the air conditioning" by removing humidity since "[h]igh humidity levels are often associated with mold growth."

Uncontradicted evidence establishes that Siemens followed up on Ungers' recommendations by having its HVAC contractor thoroughly inspect the air conditioning system to ensure proper functioning.[1] Jermer was not involved in these activities.

In early 2001, the supervisor grew concerned with Jermer's conduct in the workplace. He noted increased absenteeism and several confrontations between Jermer and co-workers. The supervisor consulted with the human resources department in February 2001 regarding his concerns and decided at that time to begin documenting the problems without notifying Jermer. Between March 2001 and September 2001 the supervisor identified nineteen days when Jermer either arrived late or left early. The supervisor also documented three encounters during the same time frame in which Jermer responded to requests from co-workers with statements like "that's [someone else's] problem," "[y]ou're beginning to piss me off, that's not part of my objectives," and "I took myself off that project."

In June 2001, in response to a co-worker's persistent cough and his own irritated sinuses, Jermer researched air filters and identified one that he claimed would remove some mold spores from the air in relatively small spaces. He requested from his supervisor that the company provide the filter and subsequently filed an official requisition form requesting the filter. After initially indicating he would approve the request, the supervisor denied it.

In July 2001, as they were walking to an unrelated meeting at the human resources department, Jermer asked his supervisor how the air quality project was going and asked if he needed any assistance with re-testing. Jermer reports that, as part of this discussion, he stated "I still think there's issues." In response to Jermer's offer of assistance, the supervisor said, "we'll see." On September 12, 2001, the supervisor initiated a meeting with Jermer. In the meeting, he told Jermer, for the first time, that he was concerned about Jermer's job performance.[2]

Siemens CEO Richard Buzun sent an e-mail to all employees on September 21, 2001, regarding the effects of the attacks of September 11 and raising the possibility that cuts would have to be made to "right size" the company. This led to an overall reduction-in-force plan, which required the supervisor to cut one of the four positions in Jermer's department.

One of the four employees had worked at Siemens less time than Jermer, but he had significantly different job responsibilities than Jermer or the two other more senior engineers in the department. The supervisor filled out a so-called "matrix," provided by the human resources department, to decide which of the employees would be laid off. Jermer received the lowest rankings. His name appears on a list of lay-offs dated September 28, 2001, that was e-mailed from John Hoover, Human Resource Manager to Chad

---

[1] Kroeger's affidavit states:

> As a result of the [Ungers report], the following actions were taken by Siemens:
> a. the percent of outside intake air was increased;
> b. Century checked all drip pans on the HVAC units;
> c. Century inspected all HVAC systems for optimal performance, checked for leaks, and found no problems;
> d. I verified that the filter changes on the HVAC system were completed at the appropriate intervals; and
> e. I verified that preventative maintenance items related to the HVAC system were being completed in a timely and thorough manner.
>
> J.A. at 71.

[2] Jermer received very positive annual evaluations from his supervisor in October 1999 and October 2000. No negative feedback was provided in his May 2001 mid-year review. On June 18, 2001, his supervisor nominated Jermer for a company award for his work on a project unrelated to these proceedings.

McLelland, Siemens' General Manager at Norwood. In the accompanying e-mail, Hoover wrote, "Here is the finalized information that you requested."

On October 2, 2001, Jermer contacted Siemens' ethics hotline and spoke to Mike Troy, a member of the company's ethics committee. Jermer reported his concerns that the air quality problems had not been addressed, as well as unrelated kickback allegations against his supervisor and others. Troy investigated but found no merit to the allegations.

Jermer's employment was terminated in a meeting with managers on October 15. Shortly thereafter, one of the other engineers in the department was promoted out. Jermer argues that this event should have fulfilled the department's one person layoff requirement and should have allowed him to be rehired. Siemens responded that neither Jermer's position, nor the position of the engineer who was promoted, had been filled.

After his termination, Jermer complained both to Troy and to CEO Buzun, arguing that he was the victim of a retaliatory firing. The company's response was that the decision to terminate Jermer was finalized on September 28, and thus his complaints in October were not relevant to that decision.

In the months following, Jermer filed complaints with OSHA and the Norwood Health Department. Both agencies investigated, but neither found any basis for additional action.

## II.

The primary basis for the district court's ruling in favor of Siemens was that Jermer failed to prove the jeopardy element of his *Greeley* claim:[3] "a plaintiff who cites workplace safety as the public policy satisfying the clarity element . . . must have at least lodged complaints about workplace safety in order to satisfy the jeopardy element of the claim." The court also found that

> September 28, 2001 is the critical date [for identifying such complaints] because the evidence of record establishes unequivocally that Plaintiff was chosen for discharge as of that date. Nothing that occurred after September 28 was a factor in that choice. Accordingly, even if Plaintiff can establish that he engaged in activities related to the public policy manifested in Ohio laws governing workplace safety after September 28, he could not prove that those activities caused his discharge. In other words, if Plaintiff could satisfy the second element of his claim with evidence of activities after September 28, he would, nevertheless, fail to establish that the third element of the claim is satisfied.

We agree with the district court's factual determination that September 28 is a critical date because Jermer was chosen for discharge on or before that date in connection with the reduction in force. Thus, in order for the plaintiff's claim to survive, he must demonstrate - in the language of the Ohio Supreme Court - that "dismissing [him] under circumstances like those involved in plaintiff's dismissal [prior to September 28] would jeopardize public policy" in favor of workplace safety.

*Himmel v. Ford Motor Co.*, 342 F.3d 593 (6th Cir. 2003), is our most recent case interpreting the jeopardy element of a *Greeley* claim. The case provoked a difference of opinion about the meaning and scope of this new tort. As the majority makes clear, an employee need not cite a specific statute or law, or even be certain that a particular law has been abridged, in order to prove the jeopardy element. *Id.* at 600. But *Himmel* assumes that the employee must at least have made clear to his employer that he is invoking a governmental policy as the basis for his complaint, not just his own self-interest. Otherwise, the employer is not effectively put on notice that the employee is acting not only for himself, but also for the public at

---

[3] The district court assumed without deciding that the "clarity" element was satisfied.

large. The "jeopardy" element does not state simply that the policy has been violated, but that the policy itself is at risk if dismissals like the one in question are allowed to continue. The Ohio Supreme Court views employee complaints and whistleblowing as critical to the enforcement of the State's public policy, and the Court therefore intended to make employees de facto "enforcers" of those policies. Toward this end, the Court granted them special protection from Ohio's generally applicable at-will employment status when the employees act in this public capacity. In exchange for granting employees this protection, employers must receive notice that they are no longer dealing solely with an at-will employee, but with someone who is vindicating a governmental policy. Employers receive clear notice of this fact when actual government regulators arrive to audit or inspect. They should receive some similar notice when an employee functions in a comparable role. Even though an employee need not cite any specific statute or law, his statements must indicate to a reasonable employer that he is invoking governmental policy in support of, or as the basis for, his complaints.

In this case, one of the statements that Jermer claims raised an issue about the quality of the office's air occurred on July 20, 2001, on a walk with Kroeger, his supervisor, to the human resources office. Jermer asked for an update on the company's response to the Ungers report. He stated "I still think there's issues" with the air and offered his assistance in implementing its recommendations. In addition, in June and July 2001, when Jermer requested an air filter for his work space in response to his own sinus irritation and the cough of a co-worker, Jermer mentioned his concerns about the air quality as his rationale for requesting the filter, although he carefully refrained from mentioning mold, since he believed use of that word was a sensitive issue. These are the only events before September 28 that Jermer can reasonably argue constituted complaints about air quality.

In neither of these encounters did Jermer in any way indicate that he was invoking a governmental policy in favor of workplace safety. Jermer's off-the-cuff statement "I still think there's issues" while discussing outstanding projects was neither clear nor specific enough to rise to the level of a complaint about possible violation of a governmental policy. While such a complaint need not always be in writing, it must do more than merely indicate a preference or make a vague statement. It must at least connect the employer's conduct in some way to government policy relating to employee health.

His request for an air filter in his own office was more in the nature of a request to turn the air conditioner or heat up or down. It is similar to a request to keep a window open so that the office will have more fresh air. It does not assert or in any reasonable way indicate that an employee is acting to protect "public policy." In response to questions about the purity of the air in the building, the employer had two sets of experts conduct independent assessments. It had contractors check for leaks and clean the air conditioning system. The contractors reported the system in good working order. We conclude that the employee's request for an air filter for his office was not equivalent to an assertion of a violation of governmental policy concerning air quality and therefore fails to establish the jeopardy element of a *Greeley* claim.

We agree with the district court that Jermer's statements and requests to Siemens failed to refer to any underlying governmental policy with the degree of specificity and clarity necessary to give a reasonable employer notice of the policy basis of the complaint. We also agree that the dismissal here would not "jeopardize the public policy" of maintaining a safe workplace. This conclusion is reinforced by the fact that none of the employees whose complaints about the air quality prompted the tests in 1999 and 2000 were discharged.

Accordingly, the district court's summary judgment for defendant is AFFIRMED.